FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NOV 1 4 2007
nov 14 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| CENTRAL OHIO ENERGY, INC. <br> on behalf of itself and <br> all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SAUDI ARABIAN OIL COMPANY d/b/a <br> SAUDI ARAMCO, <br> SAUDI PETROLEUM INTERNATIONAL, <br> INC., <br> ARAMCO SERVICES COMPANY, <br> SAUDI REFINING, INC., <br> MOTIVA ENTERPRISES LLC, <br> PETROLEOS de VENEZUELA S.A., <br> PDV AMERICA, INC., <br> CITGO PETROLEUM CORPORATION, <br> PDV HOLDING, INC., <br> PDV MIDWEST REFINING, LLC, <br> OPEN JOINT STOCK COMPANY <br> "OIL COMPANY LUKOIL" A/K/A <br> OAO LUKOIL A/K/A LUKOIL OAO <br> A/K/A  LUKOIL HOLDINGS, <br> LUKOIL AMERICAS CORPORATION, <br> LUKOIL INTERNATIONAL TRADING <br> AND SUPPLY COMPANY; LUKOIL <br> PAN AMERICAS LLC; <br> GETTY PETROLEUM MARKETING, <br> INC. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> 07cv6462 <br> JUDGE LEFKOW <br> MAG. JUDGE ASHMAN <br><br> _ _ _ _ _ _ _ _ _ _ _ <br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, by and through its attorneys, brings this action on behalf of itself and all

others similarly situated for treble damages and injunctive relief under the antitrust laws

of the United States against the above-named Defendants (collectively, "Defendants").
Plaintiff respectfully demands a trial by jury and complains and alleges as follows:

## JURISDICTION AND VENUE

1.      The claims in this Complaint are brought under Sections 4 and 16 of the
Clayton Act 15 U.S.C. §§15 and 26, to recover treble damages and costs of suit,
including reasonable attorneys' fees, against Defendants for the injuries sustained by
Plaintiff and members of the Class by reason of the violations of Section 1 of the
Sherman Act (15 U.S.C. § 1) as alleged herein.

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 and § 1337,
and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 and 26. Alternatively,
jurisdiction is conferred upon this Court by 28 U.S.C.§1330 with respect to claims
against Saudi Arabian Oil Company d/b/a Saudi Aramco and Petroleos de Venezuela
S.A.

3.      Venue is proper in this Judicial District pursuant to Sections 4, 12, and 16
of the Clayton Act, 15 U.S.C. § 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d).

4.      Defendants have agents, transact business, or are found within this Judicial
District. Plaintiff's claims alleged in this Complaint arise in part within the United States
and this District. Interstate trade and commerce as described herein has been carried out
in part within this District. Defendants have transported and sold crude oil and Refined
Petroleum Products (RPP's) in the stream of interstate commerce that have reached this
District.

2

## NATURE OF THE CASE

5.      This lawsuit is brought as a class action on behalf of all persons who purchased RPP's for delivery in the United States directly from any Defendants during the Class Period. Plaintiff alleges that during the Class Period, Defendants and their co-conspirators participated in a conspiracy to fix, raise, maintain and stabilize the prices of RPP's sold directly to the Class in the United States in violation of the antitrust laws. The conspiracy affected billions of dollars in interstate commerce. Because of Defendants' anticompetitive conduct Plaintiff and other members of the Class paid artificially inflated prices for RPP's and, as a result, have suffered antitrust injury to their business or property. Defendants' acts constitute a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. §1).

6.      In addition, this action is instituted to secure injunctive relief against Defendants to prevent them from further violating Section 1 of the Sherman Act as alleged in this Complaint.

## DEFINITIONS

7.      The following definitions shall apply to the allegations herein:

     A.     "Crude Oil" refers to unrefined petroleum which is shipped in international and domestic United States commerce to refineries for processing into Refined Petroleum Products;

     B.     The term "Refined Petroleum Products" (hereafter "RPP's") refers to the products processed and sold from refineries or storage facilities of Defendants, including gasoline, heating oil, diesel fuel, aviation fuel, lubricants, asphalt, petrochemicals, and refined waxes;

     C.     The term "Refining" means processing crude oil into RPP's as defined in paragraph (7)(B);

D.   The term "Class Period," as used herein, refers to the period from November 30, 2002 to the date on which this Complaint is filed and includes any time period enlarged by the tolling of the statute of limitations as a result of any other pending class action.

E.   The term "Person," as used herein, refers to any individual, partnership, corporation, association, or other business or legal entity;

F.   Energy Information Administration (hereafter "E.I.A.") refers to the United States Department of Energy website that contains historical and statistical data on the global and domestic oil industry including RPP's (www.eia.doe.gov); and

G.   The term "bpd" is an acronym for "barrels per day".

8.   Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or organization, the allegation means that the corporation or organization engaged in the act, deed or transaction by or through its officers, directors, agents, employees, servants or representatives while they were actively engaging in the management, direction, control or transaction of its business or affairs.

## PARTIES

9.   **Central Ohio Energy, Inc**. is an Ohio corporation with its principal place of business located in Mansfield, Ohio. During the Class Period **Central Ohio Energy, Inc** purchased RPP's directly from one of the Defendants and was injured by reason of the antitrust violations alleged in this Complaint.

### Defendants and Co-Conspirators

10.   Defendant Saudi Arabian Oil Company d/b/a Saudi Aramco ("Saudi Aramco") is a Saudi Arabian commercial corporation acquired from private owners in 1988 by Saudi Arabia and is owned by the government of Saudi Arabia. It shipped crude oil and RPP's to the United States during the Class Period and refined and sold RPP's in

the United States through its subsidiaries and agents, Saudi Petroleum International, Inc. ("Saudi Petroleum"), Aramco Services Company ("Aramco Services"), Saudi Refining, Inc. ("Saudi Refining") and Motiva Enterprises LLC ("Motiva"). Saudi Aramco exercised control over the aforesaid subsidiaries during this period and they acted as its agents. In 2005 alone Saudi Aramco exported 1.53 million bpd of petroleum products to the United States (EIA).

11.    Although Saudi Aramco is wholly owned by the government of Saudi Arabia, the official position of that government as expressed on its official website is that Saudi Aramco operates, pays taxes, pays profits to ownership and makes pricing and other management decisions as a commercial entity without interference and direction of the government.

12.    Defendant Saudi Petroleum is a Delaware corporation formed in 1998 with offices in New York. During the relevant period alleged herein, it arranged transportation and delivery of crude oil and RPP's to Motiva which refined and sold RPP's in the United States.

13.    Defendant Aramco Services is a Delaware corporation formed in 1950 and is owned and controlled by Defendant Saudi Aramco with its headquarters in Houston, Texas. It is the parent of Saudi Refining. During the relevant period alleged herein, Aramco Services provided supervisory services for Saudi Aramco and coordinated the operations of Saudi Petroleum, Saudi Refining and Motiva in the United States during the Class Period.

14.    Defendant Saudi Refining is a Delaware Corporation formed in 1988 and is a subsidiary of Defendant Saudi Aramco with its headquarters in Houston, Texas.

During the relevant period alleged herein, Saudi Refining coordinated the process of importing crude oil and RPP's into the United States with Saudi Aramco and Saudi Petroleum and the refining and sale of RPP's in the United States by Motiva.

15.     Defendant Motiva is a Delaware limited liability corporation formed in 1998 to sell and refine petroleum products. Saudi Refining and Shell Oil Corporation each hold 50% of the shares of Motiva which operates three refineries in the United States with a capacity of 774,000 bpd. Motiva also owns 42 refined product storage terminals in the eastern and southeastern United States with an aggregate storage capacity of approximately 20.6 million barrels. It operates in 26 states of the eastern and southern United States under the name of Shell Oil. Defendant Saudi Aramco supplies more than 505,000 bpd of crude oil in coordination with Saudi Petroleum to Motiva which refines and sells RPP's in the United States.

16.     During the relevant period alleged herein, Saudi Aramco and its subsidiaries and affiliates made Defendants herein operated substantially as a single enterprise for the purpose of pricing and selling RPP's from their refineries and storage terminals to extract supra-competitive profits from the sale of RPP's in the United States to Plaintiff Class. Saudi Aramco and its subsidiaries and affiliates named as Defendants herein exercised ultimate management control over the prices that Motiva charges for RPP's in the United States.

17.     Defendant Petroleos de Venezuela, S.A. ("PdVSA") is a Venezuelan commercial oil corporation owned by the government of Venezuela and is the corporate parent of and exercises complete control over its subsidiaries and agents, PDV America, Inc. ("PDV America"), PDV Holding, Inc. ("PDV Holding"), Citgo Petroleum

6

Corporation ("Citgo") and PDV Midwest Refining, L.L.C. ("PDV Midwest"). PdVSA and its subsidiaries produce and market crude oil and RPP's. During the Class Period, PdVSA transported its crude oil and RPP's to its subsidiaries which refined crude oil and sold RPP's to Plaintiff and members of the Class. In 2005 alone PdVSA exported 1.529 million bpd of petroleum products to the United States (EIA).

18.     Although PdVSA is wholly owned by the government of Venezuela, PdVSA operates, seeks and maintains commercial credit ratings, pays taxes, pays profits to ownership and makes independent pricing and other relevant management decisions as a commercial corporation.

19.     Defendant PDV America is a Delaware corporation formed in 1986. It is wholly owned by PdVSA and oversees PdVSA's subsidiaries which import crude oil and refine and sell RPP's in the United States.

20.     Defendant Citgo is a Delaware corporation with its principal place of business in Houston, Texas. Citgo is a subsidiary of PDV America and operated refineries and storage terminals and sold RPP's directly to Plaintiff and members of the Class. Citgo directly owns or operates 859,000 bpd of refining capacity in the United States.

21.     Defendant PDV Holding is a Delaware corporation formed in 1997. It is a subsidiary of PdVSA and oversees the importation of crude oil and the refining and sale of RPP's in the United States.

22.     Defendant PDV Midwest Refining is a Delaware corporation formed in 1997 and is a subsidiary of PdVSA. PDV Midwest is engaged in the refining, marketing

and transportation of its RPP's in the Midwestern United States and in the East and Gulf Coasts.

23.    During the relevant period alleged herein, PdVSA and its subsidiaries and affiliates made Defendants herein operated substantially as a single enterprise for the purpose of pricing and selling RPP's from their refineries and storage terminals in order to extract supra-competitive profits from the sale of RPP's to Plaintiff Class in the United States.

24.    Defendant Open Joint Stock Company "Oil Company Lukoil", aka OAO Lukoil, aka Lukoil OAO, and aka OAO Lukoil Holdings ("Lukoil ") is a commercial Russian Corporation that was founded in 1991. It is publicly traded on global stock exchanges including the NASDAQ under the name of Lukoil (OAO) and is privately owned and operated. Lukoil is the parent corporation of Lukoil Americas Corporation ("Lukoil Americas") which has eleven vertically integrated subsidiaries incorporated in Delaware. OAO Lukoil itself and through its subsidiaries engages in the production of crude oil and operates refineries and storage terminals in several countries and, through its marketing and transportation subsidiary Lukoil International Trading and Supply Company (LITASCO), supplies RPP's to storage facilities and terminals and to Getty Petroleum Marketing Inc. (Getty) for sale in the United States.

25.    Defendant Lukoil acquired Defendant Getty on November 3, 2000, which sold RPP's directly to Plaintiff Class in the United States during the Class period. Defendant Getty is a subsidiary of Lukoil Americas and is incorporated in Delaware. Getty's headquarters are in Jericho, Long Island, New York.

8

26.    Defendant LITASCO is a Swiss Corporation established by Lukoil in 2000 with responsibility for all international trading and marketing activities of Lukoil including sales of RPP's in the United States and other countries. The LITASCO group is made up of subsidiaries and branches in the United States and other countries. Defendant Lukoil Pan Americas LLC ("Pan Americas") is LITASCO's subsidiary through whom it does business in the United States as well as Central and South America. Lukoil Pan Americas is a Delaware Corporation established in 2002. Its headquarters are in Red Bank, New Jersey.

27.    During the relevant period alleged herein, Lukoil and its subsidiaries and affiliates, including LITASCO, Pan Americas, Lukoil Americas and Getty made Defendants herein, operated substantially as a single enterprise for the purpose of pricing and selling RPP's from their refineries and storage terminals to extract supra-competitive profits from the sale of RPP's in the United States to Plaintiff Class.

28.    Other co-conspirators are the following commercial oil corporations which marketed crude oil and RPP's in international commerce during the Class Period:

A.    The National Iranian Oil Company (NIOC) is an Iranian commercial corporation owned by the Iranian Government and is engaged in exploration, production and refining of crude oil.

B.    Abu Dhabi National Oil Company (ADNO) is an Abu Dhabi commercial corporation owned by the United Arab Emirates Government ("UAE"). It maintains a controlling interest in 21 UAE domestic oil companies. Its activities include exploration, production and refining of crude oil.

C.    Kuwait Oil Company is a Kuwaiti commercial corporation owned by the Kuwait Government and engages in petroleum exploration, production and refining of crude oil.

D.    National Oil Corporation of Libya (NOC) is a Libyan commercial corporation owned by the Libyan government. NOC carries out

exploration, production and refining of crude oil through its own affiliated companies.

E.    Qatar Petroleum is a Qatar commercial corporation owned by the Qatar Government. It is responsible for exploration, production, refining, transport, storage, distribution and sale of crude oil.

F.    Nigerian National Petroleum Corporation (NNPC) is a Nigerian corporation owned by the Nigerian Government. The NNPC has 12 strategic business units, all within oil industry operations, which includeexploration, production, refining and distribution of crude oil.

G.    Sonatrach is an Algerian commercial corporation owned by the Algerian Government which oversees Algeria's exploration, production, and refining of crude oil.

H.    Pertamina is an Indonesian limited liability corporation owned by the Indonesian Government and some private stockholders and has 14 subsidiaries for the exploration, production and refining of crude oil.

I.    Pemex is a Mexican corporation owned by the Mexican government. It explores for, develops and refines crude oil.

J.    Rosneft is a Russian oil company involved in the production, marketing and refining of crude oil. Rosneft is owned by the Russian Federation.

K.    Statoil is an international crude oil and gas exploration, production and refining corporation that is majority owned by the Norwegian State but with private shareholders.

29.    There are additional unnamed co-conspirators who are representatives and agents of each of the commercial oil corporations identified above and who performed acts and made statements in furtherance of the conspiracy alleged herein.

30.    Various other persons who are not named in this Complaint participated in the violations alleged herein and have performed acts and made statements in furtherance of the conspiracy as set forth hereafter and are hereby designated as co-conspirators.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action on behalf of itself and as a class action under

the provisions of Rule 23(a) and (b) (2) and (b)(3) of the Federal Rules of Civil Procedure

on behalf of all members of the following Class:

> All persons (excluding governmental entities, Defendants, their subsidiaries and
> affiliates, and their co-conspirators and retail buyers) who purchased Refined
> Petroleum       Products in the United States directly from any of the Defendants at any
> time during the
> period from November 30, 2002 to the present.

32.     Plaintiff does not know the exact size of the members of the Class because

such information is in the exclusive control of the Defendants. Nevertheless there are at

least several thousand members of the Class geographically dispersed throughout the

United States.  Plaintiff believes that joinder of all members of the Class in this action is

impracticable.

33.     Plaintiff's claims are typical of the claims of the members of the Class

because Plaintiff and all members of the Class are direct purchasers of RPP's who paid

artificially inflated prices for RPP's due to the unlawful conspiracy alleged herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of

the Class as the interests of Plaintiff are coincident with, and not antagonistic to, those of

the members of the Class. In addition, Plaintiff is represented by counsel who are

experienced and competent in complex class action and antitrust litigation.

35.     The prosecution of separate actions by individual members of the Class

would create a risk of inconsistent or varying adjudications, establishing incompatible

standards of conduct for Defendants.

36.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members. Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

A.    whether Defendants and their co-conspirators engaged in a contract, combination and conspiracy to fix, raise, maintain and stabilize the prices of RPP's sold in the United States;

B.    whether the alleged contract, conspiracy or combination violated Section 1 of the Sherman Act;

C.    the duration and extent of the contract, conspiracy or combination alleged herein;

D.    whether each of the Defendants was a participant in the contract, conspiracy or combination alleged herein;

E.    whether the Defendants' conduct caused the prices of RPP's to be set at higher levels than they would have been absent the conspiracy;

F.    the effect of Defendants' contract, conspiracy or combination upon United States interstate commerce;

G.    the appropriate measure of damages; and

H.    whether Plaintiff and members of the Class are entitled to declaratory or injunctive relief.

37.    Class action treatment is the superior and only method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication

of this controversy. The Class membership is readily ascertainable from the Defendants' records.

38.    Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

## VIOLATIONS ALLEGED

39.    Commencing at a date some years prior to the Class Period and continuing until the present time, Defendants and co-conspirators identified in paragraphs 10 through 29 engaged in an unlawful continuing contract, combination and conspiracy in restraint of trade in violation of the Sherman Act to increase the price of RPP's sold in the United States to members of the Class.

40.    In furtherance of the conspiracy Defendants and co-conspirators discussed, met, negotiated and made agreements on supra-competitive crude oil and RPP pricing levels. Among these agreements, Defendants and their subsidiaries joined other co-conspirators and adopted a common formula for crude oil pricing and RPP pricing that was based on target profit margins on the sale of RPP's in the United States. (Wall St. Journal, June 5, 2006)

41.    Defendants and their co-conspirators implemented their pricing agreements in various ways. These methods of implementing the conspiracy included but were not limited to: falsely announcing planned reductions in crude oil pumping in order

to affect the futures market for crude oil and RPP's; pumping crude oil but withholding it from the RPP market; restricting the operating capacities of their crude oil refineries and other means intended to create the perception of or actually create supply bottlenecks and crude oil shortages that would increase the prices of RPP's.

42.    Defendants and their co-conspirators took the following actions and made the following statements in furtherance of the conspiracy during the period 1986-2002:

A.    In 1986, PdVSA entered the United States RPP's market by forming PDV America and acquiring 50 percent of Citgo. (E.I.A.)

B.    In 1989, Saudi Aramco entered the United States RPP's market when its subsidiary, Saudi Refining, formed a joint venture with Texaco Corporation to acquire the Port Arthur Texas Refinery under the name of Star Enterprises LLC in order to refine and market RPP's in the United States.

C.    In 1990, PDV America acquired 100% of Citgo in order to refine and market RPP's.

D.    During the period 1993-1997, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators not to increase their crude oil production. (E.I.A.)

E.    In 1997, PdVSA formed PDV Midwest Refining to engage in refining, marketing and transportation of RPP's.

F.    In 1998, Saudi Refining became the owner of 32.8 percent of Motiva when it combined Star Enterprises LLC with Texaco and Shell Oil Company to form Motiva and become the largest marketer of RPP's in a twenty-six state region of the Eastern and Gulf Coast areas of the United States.

G.    On March 30, 1998, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production of crude oil and in an official communiqué OPEC stated:

"that member countries have agreed to voluntary cuts from each country's current production levels in an attempt to boost prices." (E.I.A.)

H.  On June 24, 1998, Saudi Aramco, PdVSA and Lukoil agreed with representatives of other co-conspirators to cut production of crude oil:

> "Together with promises from non-OPEC nations Russia, Oman and Mexico, world oil producers have pledged to cut world wide production by approximately 3.1 million bpd." (E.I.A.)

I.  On March 23, 1999, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators:

> "to cut oil output by a combined 2.104 million bpd effective April 1999 for one year." (E.I.A.)

J.  On March 28, June 21, September 10 and October 2000, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to raise production of crude oil, but on November 12, 2000 agreed to delay any further production increases. (E.I.A.)

K.  In March 2000, Ali Rodriguez Araque, formerly Venezuela's Oil Minister, accepted the post of Secretary General Elect of OPEC and stated:

> "I have the power now to send instructions to each country." When prices breach the upper or lower limits of the band, he said he can call "each country on the phone and tell them, 'cut or increase'." (Wall St. J. March 30, 2000).

L.  On November 3, 2000, Lukoil bought Getty Petroleum Marketing, Inc. and began selling RPP's in the United States.

M.  On December 31, 2000, Ali Naimi, the Saudi Oil Minister, stated that OPEC members would cut production when ministers met on January 17, 2001. The average oil prices in 2000 were the highest (not adjusted for inflation) in seventeen years. (E.I.A.)

N.  In January 2001, Ali Rodriguez Araque, Secretary General of OPEC, stated:

> "We were forced to cut at this meeting in order to avoid a price crash in the second quarter...And we cut by one million barrels a day in March if prices continue to fall." (Wall St. J. January 18, 2001)

O.   In 2001, Saudi Refining acquired Texaco's additional 17.2 percent interest in Motiva and increased Saudi Refining's share of Motiva to 50 percent and bolstered its marketing and refining strength in North America.

P.   In 2001, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut or hold production quotas of crude oil on the following dates:

    January 17---Cut Production.

    March 17---Cut Production

    June 5---Hold to Production Quotas

    July 3---Hold to Production Quotas

    July 25---Cut Production

    November 14---Cut Production

    December 28---Cut Production

Q.   On January 1, 2002, Saudi Aramco, PdVSA and Lukoil agreed with representatives of the commercial oil corporations of Oman, Mexico, Norway and Angola to cut production for six months. (EIA)

R.   On March 18, 2002, Ali Rodriguez Araque, Secretary General of OPEC, stated:

    "I believe that production for this year has to stay at this level to keep prices at the current level." (Wall St. J. March 18, 2002)

S.   In 2002, Saudi Aramco, PdVSA and Lukoil agreed with representatives of other co-conspirators to hold production of crude oil at the January 1, 2002 levels for the entire year of 2002. Representatives of Oman and Mexico's commercial oil corporations announced that they would not increase production. (E.I.A.)

T.   In 2002, Ali Rodriguez Araque resigned as the Secretary General of OPEC to become head of PdVSA. He was replaced by Venezuelan Oil Minister Alvaro Silva Calderon.

U.  On November 7, 2002, Alvaro Silva Calderon, a representative of
    PdVSA, stated:

> "All countries have reaffirmed their commitment to the
> quotas. There are special circumstances that sometimes
> make it necessary [to overstep the limits], but we have the
> mechanisms of monitoring all members and we can control
> [the overproduction] . . . "
>
>        *   *   *
>
> "The band has been useful in fulfilling the role for which it
> was created—aid [price] stability and is doing just that."
> (Oil Daily November 7, 2002)

43.  In furtherance and in continuation of the aforesaid conspiracy Defendants
and co-conspirators took the following actions and made the following statements during
the period 2003-2006:

A.  On April 24, 2003, Saudi Aramco and PdVSA agreed with
    representatives of other co-conspirators to cut production of crude
    oil.

B.  In May 2003, Alvaro Silva Calderon, a representative of PdVSA,
    stated that OPEC seeks to "devise ways and mean of ensuring the
    stabilization of prices in international markets." (Oil and Gas
    Journal May 19, 2003).

C.  In 2003, Alvaro Silva Calderon, a representative of PdVSA,
    authorized an article stating:

> "There was no basis in the supply-and-demand picture for
> such a hike, yet the uncertainty of what might happen drove
> prices higher. So to leave such a sensitive trading
> environment to its own devices would, in our opinion, be a
> sure recipe for disaster."
>
> "First and foremost, we must strive to keep market
> volatility to a minimum and ensure that prices stay at
> acceptable levels. We consider a price range of $22 to $28
> a barrel as being reasonable, that is why we have adopted
> this as our target price band, carefully calculated as being
> fair for all market players."
>
> "However, due to the complexity of the industry and its
> exposure to so many prevailing influences, it is not a sector
> that can survive alone in a free market. It requires some

17

form of management, as is the case in some other vital sectors such as agriculture." (Article in the "United Nations Chronicle" 2003)

D.    On September 4, 2003, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production of crude oil. (E.I.A.)

E.    Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut or hold production quotas of crude oil as follows:

February 11, 2004---Cut Production   (E.I.A.)

May 22, 2004---Hold to Production Quotas  (E.I.A.)

F.    In November, 2004, Rafael Ramirez Carreno succeeded Ali Rodriguez Araque as President of PdVSA.

G.    On December 10, 2004, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production of crude oil. (E.I.A.)

H.    On its website dated May 5, 2005, PdVSA quoted Rafael Ramirez Carreno, acting both as Venezuela's Oil Minister and as President of PdVSA as follows:

Venezuela tops OPEC Quota: The country's current production is 3.3 mb/d versus the 3.4 mb/d originally programmed. PdVSA's President assures.

"The minister pointed out emphatically that Venezuela was complying with the quota established by OPEC even going a little beyond it, as we and all the other countries in the organization have agreed and in the short term, we are going to solve our problem." (www.PdVSA.com)

I.    On May 22, 2005, Rafael Ramirez Carreno, President of PdVSA, stated:

"During the June OPEC meeting we must evaluate a production cut." He then added that Venezuela should "do whatever is necessary to defend the price of oil." (Free Internet Press.com)

J.    On September 20, 2005, December 9, 2005 and January 31, 2006, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to hold to production quotas of crude oil. (E.I.A.)

K.  On May 24, 2006, Rafael Ramirez Carreno, the President of PdVSA, stated that he doubted if the OPEC cartel would ever allow prices to sink as low or outputs to rise as high as they did at the end off the 20th century. (E.I.A.)

L.  On June 1, 2006, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to hold to production quotas. (E.I.A.)

M.  In June 2006, at a speech at the 141st Extraordinary Ministerial Conference of OPEC, Rafael Ramirez Carreno, President of PDVSA and Venezuela's Oil Minister stated:

> "The success of our organization in the past six years arises from the cohesion of a common policy and strategy for our countries." (Recorded on PdVSA website.)

N.  On September 11, 2006, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to hold to production quotas. (E.I.A.)

O.  On October 19, 2006, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production. (E.I.A.)

P.  On December 14, 2006, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production. (E.I.A.)

Q.  On February 1, 2007, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production of crude oil.

R.  On March 15, 2007, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production of crude oil.

S.  Chief Executive officer, Vagit Alekperov, of OAO Lukoil Holdings, Russia's largest private sector oil producer, reiterated his intention to increase the company's refining presence, especially in Northern and Central Europe and in North America where it already has distribution networks. (Wall St. Journal, 6/29/07)

T.  Lukoil and Petroleos de Venezuela have cooperated in the production and sale of RPP's to the United States market since they entered into a Memorandum of Understanding on November 11, 2004 at which time Vagit Alekperov stated that:

> "Participation in oil and gas projects in Venezuela is an important direction in the company's development,

including supplies of oil to North American market and oil products for Lukoil retail chain in the USA". (Lukoil Press Release dated November 11, 2004)

## Petroleum Industry Organizations and Meetings

44.     The conspiratorial agreements alleged herein and acts and statements in furtherance of the conspiracy were private commercial acts committed in locations outside of the territorial boundaries of the nations in which the parent organizations of Defendants and co-conspirators are located. These locations include but are not limited to the sites hosting meetings and other events of various petroleum industry organizations, including meetings of the Organization of Petroleum Exporting Countries ("OPEC"). OPEC is a non-governmental, voluntary organization that is not recognized as a diplomatic or other official government organization by the United States. Corporate agents and officers of Defendants and their co-conspirators regularly meet with each other during the course of OPEC as well as other industry meetings conducted in various locations around the world.

45.     Saudi Aramco, PdVSA and Lukoil and their subsidiaries and affiliates joined other co-conspirators identified herein and engaged in further acts and practices and made additional statements in furtherance of the conspiracy to fix, raise, maintain and stabilize the prices of RPP's sold to Plaintiff and members of the Class.

## INJURY TO TRADE AND COMMERCE AND THE CLASS

46.     Saudi Aramco, PdVSA and Lukoil directly and through their subsidiaries and affiliates named as additional Defendants herein, as well as their co-conspirators, operate in two petroleum markets affecting United States commerce. These are the crude oil market and the RPP market.

47.     The price of crude oil is the largest cost affecting the price of RPP's. Together, Defendants and their co-conspirators have market power over both crude oil and RPP's sold in the United States.

48.     Defendants and their co-conspirators have an economic motive to agree and conspire to sell RPP's at supra-competitive prices. A failure to agree on crude oil and RPP pricing between them would mean that they would face price competition and price declines in some RPP markets. When Defendants and their co-conspirators agreed on crude oil and RPP pricing target levels, prices of RPP's to Class Members increased in the United States.

49.     The unlawful conduct of Defendants and co-conspirators described heretofore caused the prices of RPP's sold in the United States to increase during the Class Period to levels higher than they would have been absent their unlawful conduct.

50.     As a result of the unlawful conduct of Defendants and co-conspirators the price of crude oil in the United States increased from approximately $10 per barrel in 1998 to a high of over $90 per barrel in 2007 and the prices of RPP's increased to the highest levels in history.

51.    The agreements by Defendants and co-conspirators described herein in paragraphs 39 through 45 constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and § 16 of the Clayton Act, 15 U.S.C. § 26.

52.    During the Class Period, Defendants and co-conspirators operated in several states and sold and shipped, or caused to be shipped, substantial quantities of crude oil and RPP's in a continuous and uninterrupted flow in interstate commerce to refineries, storage facilities, terminals and customers located in several states.

53.    The unlawful conduct of Defendants and their co-conspirators has had a substantial and adverse impact on interstate trade and commerce in the United States and caused injury to Plaintiff and members of the Class during the Class Period. The unlawful conduct of Defendants and co-conspirators has directly, substantially and foreseeably restrained such trade and commerce.

54.    Plaintiff and members of the Class purchased RPP's at prices higher than they would have paid but for the unlawful conduct of Defendants and their co-conspirators as set forth herein, and, as a direct result, Plaintiff and members of the Class have sustained injury to their business and property.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and members of the Class pray:

A.    That the Court determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B. That the unlawful conspiracy alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation Section 1 of the Sherman Act, 15 U.S.C.§ 1;

C. That Plaintiff and members of the Class recover treble damages, as provided by law, determined to have been sustained by each of them and that joint and several judgments in favor of Plaintiff and members of the Class be entered against Defendants;

D. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing the unlawful contract, combination and conspiracy alleged herein;

E. That Defendants be enjoined from continuing their unlawful activity and ordered to cease and desist from participating in any unlawful conduct or agreements which has as their purpose increasing the prices of RPP's;

F. That Defendants be permanently enjoined from any unlawful actions intended to raise the prices of RPP's sold in the United States upon a finding that Defendants participated in the conspiracy as described in paragraphs 39 through 45;

G. That the United States subsidiaries of Defendants, Saudi Aramco, PdVSA and Lukoil which engage in the petroleum industry be sold and transferred and divested from the ownership and control of Saudi Aramco, PdVSA and Lukoil upon a finding that Defendants participated in the conspiracy

as described in paragraphs 39 through 45 and that a timetable for sale and divestiture of these subsidiaries be ordered by this Court;

H.      That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

I.      That Plaintiff and members of the Class be granted such other, further and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Dated: November 14, 2007

PLAINTIFF, **CENTRAL OHIO ENERGY, INC.** ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED

By:    /s/ Theodore T. Poulos_____

Theodore T. Poulos
Terence H. Campbell
Cotsirilos Tighe & Streicker, Ltd
Chicago, Illinois 60602
312-263-0345